16 - 3 3 2 5 JMC    16 - 3 3 2 7 JMC —

16 - 3 3 4 4 JMC

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

Your affiant, Karen Franks, Special Agent of the Federal Bureau of Investigation (FBI),

being duly sworn deposes and states as follows:

## I.     INTRODUCTION AND EXPERIENCE

1.      I am an "investigative or law enforcement officer" of the United States, within the

meaning of Section 2510 (7) of Title 18, United States Code, that is, an officer of the

United States who is empowered by law to conduct investigations of and to make

arrests for offenses enumerated in Sections 1962 and 1959 of Title, 18, United States

Code and Sections 841 and 846 of Title, 21, United States Code, and related offenses.

2.      For the purpose of the instant applications for search warrants, your Affiant is a

federal law enforcement officer under applicable provisions of the United States Code

and under Rule 41(a) of the Federal Rules of Criminal Procedure.

3.      I have been employed as a Special Agent of the FBI since August of 2012. I am

currently assigned to the Baltimore Division of the FBI and tasked with investigating

public corruption. During my employment as an FBI Agent, I have participated in

criminal investigations involving corruption of state and local public officials, drugs,

organized crime and other unlawful activities. I am currently assigned to the

Maryland Prison Task Force which investigates corrupt correctional officers

[henceforth CO's] within Maryland State and Federal Prisons.  In addition, I have

participated in investigations involving wiretaps and have reviewed taped

1

conversations pertaining to organized crime and narcotics organizations. I have participated in numerous debriefings on individuals involved in corruption, including CO's and inmates. I have also participated in numerous searches, arrests, and seizure warrants involving a variety of federal offenses.

4.      I have personally participated in the investigation of the offenses referred to herein and reviewed reports and had discussions with other Special Agents and employees of the FBI, as well as other law enforcement agencies related to the instant investigation. I am familiar with the facts and circumstances of the investigation. Through training, education and experience, I am familiar with investigations involving individuals contributing to the corruption in the State of Maryland Prison System.

## II.      ELECTRONIC DEVICES TO BE SEARCHED

5.      This affidavit is submitted in support of a search warrant for the following electronic devices, including cellular telephones and computers, seized in October 2016 as follows (collectively referred to as the "Subject Electronic Devices"):

*Cellular Phones Seized from 106 Cherry Street, Pocomoke City, Maryland (home of SHERIMA BELL) (see paragraphs 21 – 27 below)*

    1)      VERIZON SAMSUNG CELL PHONE FCC ID A3LSMB311V, MEID HEX: A00000475C78FB

    2)      LG CELL PHONE, FCC ID: BEJLX295, S/N: 908CYZP0007645

*Cellular Phones, Laptop Computers, tablet computers,  SD Card, CD, USB drive, thumb drive and external drive  Seized from 1005 Zircon Court, Salisbury, Maryland (home of ROZLYN BRATTEN) (see paragraphs 28 - 34 below)*

2

3)     INSPIRON LAPTOP WITH S/N 9T7RQP1

4)     SAMSUNG GALAXY PHONE, #DE C256691456404415845, TWO (2)

SD CARDS

**_Cellular Phones and tablet computer Seized from 113 West London Avenue, Salisbury, Maryland (home of JOCELYN BYRD) (see paragraphs 35 - 41)_**

5)     SAMSUNG GALAXY NOTE 5 - SKU: SPHN92032GLD; DEC: 256 6

91 584 006 448 677

6)     LG G4, S/N: 505KPFX0255931, MODEL LS991, FCC ID: ZNFLS991

**_Cellular Phones and Notebook Computers Seized from 34708 Main Street, Pittsville, Maryland (home of TRAVIS DENNIS) (see paragraphs 42 - 48 below)_**

7)     Blackberry Phone MEID DEC# 268436458804813652

8)     Blackberry Phone MEID DEC# 288435459700483650

9)     NEXTBOOK MODEL NX008HD8G, SERIAL YFG1013004928

**_Cellular Phones, Computer and iPad Seized from 5818 Edgepark Drive Apartment C, Baltimore, Maryland (home of CHAVIA SAVAGE) (see paragraphs 49 - 56 below)_**

10)     PURPLE VERIZON HTC CELL PHONE SERIAL # HT19EX101716

11)     SILVER IPAD, DMQJMB7AF183, S/N 1445SY03C4G8

12)     SILVER IPHONE, IMEI: 356987062724792

**_Cellular Phones, tablet computers, sim cards, Laptop Computer and USB drive Seized from 1112 Bryn Mawr, Salisbury, Maryland (home of ROBERT WATERS) (see paragraphs 57 - 60 below)_**

13)     SAMSUNG GALAXY GRAND PRIME IMEI: 990005925397151

14)     SAMSUNG NOTE 3 IMEI: 990004354275053

15)     LG CELLPHONE S/N: 604CYRN054382

16)    SAMSUNG PHONE FCC ID: A3LSMG360T

17)    X GODY PHONE S/N: 201512059731

18)    SAMSUNG SPRINT PHONE HEX: 99000440035162

19)    USB DRIVE 2.0 ADAPTER

The Subject Electronic Devices are also described in Attachment A to this affidavit.

6.    The Subject Electronic Devices are currently in the possession of agents of the FBI at the Baltimore Field Office.   Your affiant submits that there is probable cause to believe that the Subject Electronic Devices contain evidence of violations of Racketeering Conspiracy in violation of Title 18, United States Code, Sections 1962(d), Conspiracy to Distribute and Possess with Intent to Distribute Drugs, in violation of Title 21, United States Code, Section 846, and Deprivation of Rights under Color of Law, 18 U.S.C. § 242 (the "Target Offenses").

7.    The facts set forth in this affidavit are based upon my personal knowledge, knowledge obtained during my participation in this investigation, knowledge obtained from other investigators, my and other investigators' review of documents in relation to this investigation, communications with other, including individuals involved in the Target Offenses, who have personal knowledge of the events and circumstances described herein, information gained from the interception of wire communications, and information gained through your Affiant's training and experience. To the extent that this affidavit contains statements made by witnesses, those statements are set forth only in part and in substance and are intended to accurately convey the information, but not to be verbatim recitations, unless indicated otherwise. This

4

affidavit is submitted for the limited purpose of establishing probable cause in the

support of these applications for search warrants, and thus, it does not contain every

fact known to me or the United States.

**III. The Investigation**

8.     Investigators to date have learned that contraband smuggling occurs in every housing

unit at ECI. Inmates offer corrupt officers bribe payments to smuggle contraband into

the institution and corrupt officers approach inmates and offer to smuggle contraband

into ECI in exchange for bribes. Inmates selling contraband are able to make

hundreds or thousands of dollars a week selling contraband and corrupt COs are able

to make similar amounts smuggling it into the institution. Inmates at ECI use outside

accomplices to assist in contraband smuggling activities by meeting with corrupt

officers, acquiring items of contraband, and managing the profits of the contraband

proceeds. The outside facilitators are crucial in furthering the success of the

contraband organization.

*Title III Intercepts*

9.     Interceptions were authorized on a cellular telephone used by MARCUS LISBON

("Target Telephone 1"), and a contraband cellular telephone used by MICHAEL

COUNTS and TRAVIS GIE (Target Telephone 2) on May 22, 2015. Interception on

TT1 ceased on June 21, 2015 and interception on TT2 ceased on September 18, 2015.

Interceptions were authorized on a cellular telephone used by CO AARON ENNIS

on July 6, 2015, ("Target Telephone 3") and interceptions ceased on September 2,

5

2015. Interceptions were authorized on a cellular telephone used by ANGEL

WHITTINGTON on September 16, 2015, ("Target Telephone 4") and interceptions

ceased on October 2, 2015. Interceptions were authorized on a cellular telephone used

by JESSICA VENNIE on October 26, 2015, ("Target Telephone 5") and a contraband

cellular telephone used by MARK LANCE ("Target Telephone 6"). Interceptions

ceased on November 25, 2015.  Interceptions were authorized on a cellular telephone

used by JOSEPH BRANCH on  November 12, 2015, ("Target Telephone 7") and

interceptions ceased on January 9, 2016. Interceptions were authorized on a cellular

telephone used by TERNELL LUCAS on  December 22, 2015, ("Target Telephone

9") and interceptions ceased on January 21, 2016. Interceptions were authorized on a

cellular telephone used by RAMEL CHASE on February 10, 2016 ("Target

Telephone 10") Interception terminated on April 8, 2016.  Interceptions were

authorized on a cellular telephone used by SAMUEL JOHNSON on February 1,

2016, ("Target Telephone 11") and interceptions ceased on February 28, 2016.

Interceptions were authorized on a cellular telephone used by APRYL ROBINSON

on March 15, 2016, ("Target Telephone 12"). Two additional lines used by

ROBINSON ("Target Telephone 13" and "Target Telephone 14") were authorized on

April 14, 2016.  Interception of all three phones belonging to ROBINSON terminated

on May 13, 2016.

*Cooperating Witnesses*

10.    Numerous inmates have agreed to be interviewed and have testified under oath.

        These cooperators were informed of their obligation to tell the truth and what would

happen if they were not truthful. All of the cooperators stated they understood the penalties of perjury and swore to tell the truth. The information they provided has been corroborated by Title III interceptions, cooperator interviews, ECI jail calls, and from reports received from ECI intelligence officers.

## IV.   STATEMENT OF PROBABLE CAUSE

11.    Your affiant submits that there is probable cause to believe that the Subject Electronic Devices contain evidence of violations of the Target Offenses.

12.    Based on my training and experience, your affiant knows that persons involved in the Target Offenses: (a) keep and maintain records of their various activities and these records are concealed in cellular telephones; (b) utilize cellular telephones (including Smartphones) and other electronic communication devices to facilitate the commission of the Target Offenses; (c) store information on cellular telephones that is of evidentiary value in identifying co-conspirators; (d) take or cause to be taken photographs of themselves, their associates, their property, and their contraband on electronic devices; and (e) often use multiple cellular telephones in order to avoid detection by law enforcement.

13.    In January of 2014, an investigation was opened to examine allegations of corruption occurring at ECI. Information was brought by current intelligence officers at ECI to federal investigators that revealed that corrupt correctional officers (COs) were smuggling contraband in to ECI and delivering it to inmates. Many of these inmates were validated gang members. These intelligence officers had reviewed numerous ECI jail calls and interviewed multiple confidential informant inmates (CIs).

14.     ECI is broken down into four sections, including the two main housing units referred

to as the East and West Compounds, the Annex, and Poplar Hill Pre-Release

unit. The East and West Compounds house approximately 1,500 inmates. Within the

East and West Compounds, there are four housing units, which are distinct buildings

housing inmates. The housing units are further subdivided into tiers, or floors. Items

of contraband that are currently being smuggled in to ECI include marijuana, K-2

(synthetic marijuana), prescription pills, Suboxone strips,

Methylenedioxymethamphetamine (commonly known as ecstasy or Molly), cellular

telephones, tobacco, food, alcohol, pornographic DVDs and forms of currency. Many

of these items, including narcotics, cellular telephones, tobacco and pornographic

DVDs moved in interstate commerce prior to being smuggled into ECI.

15.     Generally, inmates are employing friends, girlfriends, and family members to assist

with the contraband activities. These individuals, collectively referred to as "the

facilitators," acquire contraband, collect payment for contraband sold in ECI by the

inmate, pass contraband to COs in order to be brought into the prison, and sometimes

smuggle small amounts directly to the inmate during visitation at the prison. The use

of telephones is an integral part of the contraband smuggling activity. Facilitators

coordinate with inmates through contraband phones and over the Global Tel Link

system or "jail calls." Often the inmates attempt to conceal their identity by using the

account of another inmate. This investigation has revealed that there are often

contraband cellular telephones in use by inmates inside the prison.

***Return of Federal Indictment and Execution of Search and Arrest Warrants in October 2016***

16.    On September 19, 2016, a federal grand jury handed up two indictments charging a

total of 80 persons in connection with the ECI investigation, including 18 correctional

officers, 35 inmates and 27 facilitators. The charges were the Target Offenses for this

affidavit. Among the persons indicted were the occupants of the residences from

which the Subject Electronic Devices were recovered: SHERIMA BELL, ROZLYN

BRATTEN, JOCELYN BYRD, TRAVIS DENNIS, CHAVIA SAVAGE, and

ROBERT WATERS, all of whom were charged with the first two Target Offenses: .

Arrest warrants were also issued for those indicted.

17.    On October 5, 2016, the individuals named in the September 19, 2016 indictment

were arrested pursuant to the arrest warrants.

18.    Also on October 5, 2016, search warrants were executed at several locations in

Maryland, including the following:

(1) 106 Cherry Street, Pocomoke City, Maryland (home of SHERIMA BELL)
(2) 1005 Zircon Court, Salisbury, Maryland (home of ROZLYN BRATTEN)
(3) 113 West London Avenue, Salisbury, Maryland (home of JOCELYN BYRD
(4) 34708 Main Street, Pittsville, Maryland (home of TRAVIS DENNIS)
(5) 5818 Edgepark Drive Apartment C, Baltimore, Maryland (home of CHAVIA
SAVAGE)
(6) 1112 Bryn Mawr, Salisbury, Maryland (home of ROBERT WATERS)


***Racketeering and drug trafficking activities of ECI inmates and correctional officers at ECI
and others and the Subject Electronic Devices recovered from searches of residences and
one person in October 2016***

19.    The investigation has revealed that – and the Affidavits describe – BELL,

BRATTEN, BYRD, DENNIS, and WATERS were correctional officers at ECI who

participated in the racketeering and drug trafficking conspiracy involving inmates at ECI. The investigation has also revealed that that SAVAGE was an outside facilitator who assisted inmates in the conspiracy.

**SHERIMA BELL**

20.     CO Bell was a correctional officer at ECI who smuggled contraband.

21.     According to Cooperating Inmate 10 (hereinafter "CI 10"), from approximately June 2013 to February 2015, he was involved in a sexual and business relationship with CO BELL. During that time period, BELL and CI 10 routinely had sex in CI 10's cell while CO Shakia Waters made sure no one saw. During the course of their relationship, BELL smuggled marijuana into ECI twice for CI 10. BELL obtained the marijuana from her brother. BELL also gave CI 10 inmate "snitch notes," instead of delivering them to intelligence officers. "Snitch notes" are designed to be confidential communications from inmates to intelligence officers. As a result, CI 10 was aware of whether other inmates were providing information relative to his and other inmate's contraband smuggling activities. BELL and CI 10's relationship ended when he was moved to another facility.

22.     According to Cooperating Inmate 11 (hereinafter "CI 11"), CO BELL smuggled contraband for inmates that were members of the Blood gang.

23.     According to Cooperating Inmate 12 (hereinafter "CI 12"), CO BELL smuggled contraband for ECI inmate Darian HOLMES.

24.    On March 15, 2016, at approximately 9:01 PM, law enforcement officers intercepted

a series of text messages between ROBINSON and CO ERICA COOK. The

following is an excerpt of their conversation:

> ROBINSON: he said can you see what she says about one pack with the
>
> watch inside for $2,500
>
> CO COOK: just one watch for $2,000

At approximately 9:30 PM, ROBINSON stated, "so when you were talking about

how she want the work broken down, you said if it's a pound she want it broken down

into four ounce packs right?" CO COOK responded, "yeah." ROBINSON then asked,

"so if it's a pound how much does she want for each pack?" CO COOK responded,

"so I guess she saying like if it's a pound she wants $2,000, half a pound is $1,000. So

I guess it'll be, if it's $1,000 divided by four, what that, $250 a pack, if we doing it in

fours." ROBINSON then asked how much she is going to charge for a phone and CO

COOK responded, "it's $2,000 for, um, she said if it's a Samsung Galaxy like top of

the line, whatever, she said its $2,000." ROBINSON then told CO COOK that is a lot

of money and asked CO COOK how much a less expensive phone would cost. CO

COOK told ROBINSON the prices that BELL offered and ROBSINSON explained

that she was going to try to put a small cell phone inside one of the packages

ROBINSON asked, "she gonna be able to do it like that?" CO COOK then told

ROBINSON, "long as the package isn't too bulky, like honestly." ROBINSON stated,

"she said the one last time was too big. I wish I could talk to her. I need to talk to her

so I can bring exactly what she wants. And it's blowing me because she won't talk to me." CO COOK agreed with ROBINSON and stated she will try to gether to contact ROBINSON. ROBINSON told CO COOK, "tell her to call me, I'm not a monster, I'm not the Feds, I'm not like that, I'm not none of that, but I want to get a feel for what she wants how she wants it." ROBINSON then asked CO COOK if the package was too thick last time or too long and CO COOK responded, "it was too thick. And like just coming because like she can't honestly, she couldn't, she was too scared to come in with it and I had to bring it in for her and like give it to her." CO COOK then told ROBINSON, "like with the phone, if you bring, if we're going to bring in a phone, like it's going to have to be like a two man operation. Like, I'm gonna have to, like if I work overtime or something like that yeah or I have to make sure I'm on a post that way it will allow her to slide by." ROBINSON said "ok ok." CO COOK then stated, "because that whole going through the metal detector is still kinda iffy and we don't want to chance it... so at least if it's just a pack she can have that on her and if push comes to shove, I'll have to bring in the phone and just give it to her." Your affiant believes that CO COOK and ROBINSON were discussing smuggling contraband into ECI through BELL. During the conversation, CO COOK informed ROBINSON of BELL's prices for smuggling a half pound or pound of K2 into ECI ("a pound she wants $2,000, half a pound is $1,000"). ROBINSON also wanted to smuggle a phone into ECI, for which BELL wanted to charge $2,000. ROBINSON and CO COOK then discussed previous smuggling attempts and BELL's apprehension about bringing in large contraband packages into ECI. Your affiant believes that CO COOK and

12

BELL have previously smuggled contraband delivered to them by ROBINSON into ECI.

25. Your affiant knows from toll records that CO COOK was in contact with BELL immediately after this conversation.

26. During the search of BELL'S residence at 106 Cherry Street, Pocomoke City, Maryland, the following Subject Electronic Devices were recovered: (1) VERIZON SAMSUNG CELL PHONE FCC ID A3LSMB311V, MEID HEX: A00000475C78FB (2) LG CELL PHONE, FCC ID: BEJLX295, S/N: 908CYZP0007645. These items were found in the top drawer of one of the dressers in the master bedroom with BELL'S personal items. BELL was not present at the residence during the execution of the search warrant.

## ROZLYN BRATTEN

27. BRATTEN was a correctional officer at ECI assigned to Housing Unit 1. BRATTEN smuggled contraband for inmates. BRATTEN was mentioned during an intercepted call between CO RAYFIELD, another CO at ECI who smuggled contraband in exchange for bribes and will be discussed below in more detail, and inmate BRANCH on November 30, 2015. RAYFIELD told BRANCH, "me & bratten cool. Me and stafford cool = I get to c u."

28. Cooperator #1 said that BRATTEN would smuggle contraband to inmates GARON FLETCHER and SAMUEL JOHNSON. The cooperator testified that BRATTEN would go into a bathroom on the tier to deliver contraband. According to the

cooperator, FLETCHER and S JOHNSON would follow her into the bathroom to retrieve the contraband.

29.   Cooperator #2 overheard BRATTEN discuss an attempted payment for contraband. The cooperator said BRATTEN was a "horse" who smuggled contraband for members of the Bloods gang at ECI. BRATTEN charged $1100 to smuggle three or four cans of tobacco into ECI.

30.   Cooperator #3 overheard two inmates having a discussion about BRATTEN smuggling contraband for them.

31.   Cooperator #4 assisted BRATTEN smuggle contraband to an inmate.

32.   Cooperator #5 had direct personal knowledge that inmates and the family of inmates would mail BRATTEN money orders in return for smuggling contraband into the jail. The cooperator overheard telephone conversations where an inmate directed his outside facilitator to mail BRATTEN a money order. This cooperator also reported that he heard BRATTEN warn inmates that Intel officers were about to search the tier for contraband.

33.   During the search of BRATTEN'S residence at 1005 Zircon Court, Salisbury, Maryland, the following Subject Electronic Devices were recovered: (1) Inspiron Laptop S/N 9T7RQP1 (2) Samsung Galaxy Phone, # DEC256691456404415845 with two SD cards. The laptop was found in a laptop bag along with documents belonging to BRATTEN. The Samsung phone was found in a bag along with a diary belonging to BRATTEN. BRATTEN was not present at the residence during the execution of the search warrant.

14

## JOCELYN BYRD

34.    Numerous cooperating inmates have testified that BYRD smuggled contraband into
ECI in exchange for bribes.

35.    Cooperator 11 stated that BYRD performed oral sex on him twice. She did not
charge the inmate for these services. BYRD offered to smuggle tobacco into ECI for
this inmate. The inmate knew that she smuggled for inmate "Blue" in HU7 and
inmate VANCE BOLDEN. Eventually BYRD came to this inmate and said she was
going to stop smuggling because the inmates were talking about her too much.

36.    Cooperator 10 explained that BYRD smuggled contraband to BGF inmates. The
inmate met fellow inmate MARK COLEY in HU8 and COLEY explained that he
received contraband from BYRD. The inmate witnessed BYRD go in and out of
FOLEY'S cell. The majority of contraband BYRD smuggled to FOLEY was
tobacco. When this inmate wanted to purchase tobacco he would ask FOLEY.
FOLEY would commonly reply that he was waiting for BYRD to arrive at work with
his delivery. After BYRD arrived at work, COLEY would sell the inmate a portion of
the tobacco brought in by BYRD. The inmate estimated that BYRD delivered tobacco
approximately twice a week to COLEY. COLEY would sell the contraband for
payment or Green Dot money cards. In addition to their business relationship, BYRD
and COLEY were involved in a sexual relationship. The inmate observed BYRD
give COLEY oral sex twice. After COLEY was reassigned from that area, BYRD
began a sexual and business relationship with inmate JEFF JONES. JONES operated
a smuggling operation with fellow inmate ZACH MARTIN. MARTIN placed orders

with JONES. JONES asked BYRD to smuggle the requested items into ECI and then JONES would give the items to MARTIN. JONES' associates outside ECI received items of contraband from MARTIN'S associates outside of the jail. Jones would have his associate then meet with BYRD to deliver the contraband packages to her. BYRD charged $500.00 to smuggle the items in. This inmate knew that JONES and BYRD had sexual relations in the gym. He also knew that BYRD also smuggled Suboxone strips into ECI for BGF inmate MAURICE FOX.

37.   Cooperator 4 testified that he met BYRD in HU8 in 2014. BYRD was introduced to the inmate by MAURICE FOX. FOX told the inmate that BYRD was willing to smuggle contraband into ECI. One of the inmates she smuggled for was also in HU8, an inmate known as "POPPY [previously identified as ECI inmate HAROLD S. JOHNSON]." POPPY'S family lived locally on the Eastern Shore and were friendly with CO BYRD. Inmate RAMEL CHASE and POPPY worked together to receive contraband from BYRD. CHASE paid POPPY for contraband and POPPY ordered the items through BYRD. On one occasion, CHASE paid POPPY for contraband and it wasn't delivered. CHASE wanted to have POPPY stabbed. BYRD smuggled approximately 50-100 Suboxone strips once a week. She had her own supplier of Suboxone strips. POPPY would pay BYRD between $500.00 and $1000.00 for each delivery. BYRD occasionally smuggled in tobacco for POPPY but not as often. In addition to the weekly delivery to POPPY, BYRD also smuggled for FOX once a week. BYRD would put the items of contraband in a brown paper lunch bag and deliver it. When BYRD couldn't deliver the items of contraband herself, she would

16

ask CO DANIELLE CHANDLER to deliver them for her. BYRD told this inmate

that she had been smuggling for FOX for five years. This inmate saw BYRD make

deliveries to different inmates approximately four times. BYRD explained to this

inmate that when she was speaking with an inmate about a contraband delivery she

wanted them to refer to her as "Maury." This way if rumors started or inmates were

overheard talking about her, the jail would not know who "Maury" was.

38.     Cooperator 10 stated that CHANDLER would make deliveries for BYRD.

        CHANDLER would deliver to POPPY and MAURICE FOX.

39.     Cooperator 4 stated that CHANDLER would stand guard for BYRD when she went

        in the cell to have sexual relations with COLEY. This inmate observed CHANDLER

        give Foley cups of contraband. The inmate believed these cups of contraband were

        delivered on behalf of BYRD.

40.     During the search of BYRD'S residence 113 West London Avenue, Salisbury,

        Maryland, the following Subject Electronic Devices were recovered:  (1) SAMSUNG

        GALAXY NOTE 5 - SKU: SPHN92032GLD; DEC: 256 6 91 584 006 448 677 (2)

        LG G4, S/N: 505KPFX0255931, MODEL LS991, FCC ID: ZNFLS991. These items

        were found on the nightstand in the master bedroom along with personal items

        belonging to BRYD. BYRD was present at the residence during the execution of the

        search warrant.

**TRAVIS DENNIS**

41.     CO DENNIS approached ECI intelligence officers and stated that he was receiving

        packages at 34708 Main Street, Pittsville, Maryland, that contained items of

contraband and payment. CO DENNIS was told by the intelligence officers to bring the package into them without opening it. In October of 2015, CO DENNIS turned in two packages to the intelligence officers but both times he had opened them prior to bringing them in. The first package contained four smaller packages of a green leafy substance and a USB. The second package contained Suboxone strips and a $50.00 bill. Intelligence officers believed that CO DENNIS did not turn in all of the items and/or money that was contained in each envelope.

42.    Also in October of 2015, MARTY IMES was caught with a contraband phone. Then again in December, IMES was caught with a second contraband phone. Investigators believe that after IMES was caught with the phones CO DENNIS became nervous because his phone number was on that phone. To do damage control, CO ENNIS made it appear as if he was being sent packages without his permission.

43.    In December, after being caught with the second phone, IMES was interviewed by the intelligence officers at ECI. IMES explained that he was introduced to CO ENNIS by another inmate at ECI. CO DENNIS told IMES he needed to make extra money to pay back child support. CO DENNIS gave IMES a note with his home address. IMES had an outside facilitator mail packages of 100 Suboxone strips four times to CO DENNIS. Each time $350.00 was included in the package for payment. CO DENNIS would deliver the strips to IMES' cell disguised in inmate paperwork. On the 5th time, IMES mailed four ounces of K2 and 100 strips to CO DENNIS. This is believed the green leafy substance mentioned above. IMES never received these items from CO DENNIS and IMES believed it was because his phone was seized and

CO DENNIS became nervous. IMES explained that he used both his contraband phones to speak to CO DENNIS. The following are text messages that CO DENNIS turned over to the ECI intelligence department. These messages were sent to him from IMES.

44.   On November 4, 2015, CO DENNIS sent the following text messages from IMES to the intelligence officers: 1. Whts up dude! I seen they switched tings us. Its ^ll good though. Holler when you c^n up till· 11:30 pm. 2. Wht up D. hite me bck when u get @ minute. Ill hve my phone on @ll night. Investigators are not sure when these messages were written. CO DENNIS also did not turn over any messages that he had sent to IMES nor did he indicate if he had responded to IMES.

45.   On December 4, 2015, CO DENNIS sent the following text messages from IMES to the intelligence officers: 1. C@ll me if you c@n. I w@s just trying to c@tch up w u to see how things r. 2. Im just trying to c@tch up with u. Try to hollor @t me n let me know something. I hope everything is good with you though. 3. Wht up dude. Hit me bck if u cn. Im trying to holler. @ll is well though. I wnt to @sk u something. Try to hit me. Again CO DENNIS did not state whether he responded to IMES. All of the messages from IMES indicate that he is trying to find out from CO DENNIS when he will be able to make deliveries and if CO DENNIS is still good to deliver contraband.

46.   CO DENNIS called another officer who works at ECI and stated that he was moved from the East Compound to work on the West Compound because the BGF had put a $100,000.00 hit on him. On the same day CO DENNIS told the officer that he had

19

spoken to IMES on a contraband cell phone. He explained that IMES sent contraband to his [CO DENNIS'] house including K2 and cash money.

47.    During the search of DENNIS' residence at 34708 Main Street, Pittsville, Maryland, the following Subject Electronic Devices were recovered: (1) Blackberry Phone MEID DEC# 268436458804813652 (2) Blackberry Phone MEID DEC# 288435459700483650 (3) NEXTBOOK MODEL NX008HD8G, SERIAL YFG1013004928. These items were found in DENNIS'S bedroom. Financial paperwork addressed to DENNIS were also located in this bedroom. The two cellular telephone were located on the nightstand with DENNIS'S personal items. The nextbook was located on the floor next to the bed. DENNIS was not present at the residence during the execution of the search warrant.

**CHAVIA SAVAGE**

48.    SAVAGE was TRAVIS GIE'S girlfriend. GIE was an inmate at ECI who trafficked contraband within the facility. SAVAGE managed the proceeds generated by his contraband trafficking.

49.    On June 22, 2015 SAVAGE asked GIE who she was mailing packages to in Princess Anne, Maryland. GIE explained that Crystal Foskey was a drug addict "dope fiend" that an associate of his found to open the PO Box. Foskey does not care that GIE is using the PO Box to mail contraband packages and payments.

50.    In a series of text messages on June 23, 2015, SAVAGE and GIE discussed a money order she mailed to DAVID HEARN, a CO who smuggled contraband at ECI, at the

PO Box. GIE explained that the money order arrived at the post office. Your affiant believes this was a bribe payment.

51.     On July 25, 2015, GIE received a PayPal payment from an Unknown Caller (UC.) GIE then sent the PayPal numbers to SAVAGE so she would load on her account. Your affiant believes this was payment for contraband GIE sold to an inmate associate of the UC.

52.     On July 26, 2015, GIE sent an outgoing text message to SAVAGE instructing her to load a $50 PayPal MoneyPak on her PayPal prepaid card. Your affiant believes this was payment for contraband GIE sold to an inmate.

53.     In a series of text messages on August 5, 2015, SAVAGE asked GIE why she needs to get a money order, and GIE explained that he had to pay HEARN to smuggle the contraband into ECI.

54.     On August 28, 2015, GIE and SAVAGE discussed the amount of money orders she received on his behalf. Your affiant believes these money orders were for contraband that GIE had sold to inmates.

55.     During the search of SAVAGE'S residence at 5818 Edgepark Drive Apartment C, Baltimore, Maryland, the following Subject Electronic Devices were recovered: (1) PURPLE VERIZON HTC CELL PHONE  SERIAL # HT19EX101716 (2)SILVER IPAD, DMQJMB7AF183, S/N 1445SY03C4G8 (3) SILVER IPHONE, IMEI: 356987062724792. These items were found in SAVAGE'S bedroom during the search. SAVAGE was present at the residence during the execution of the search warrant.

21

**ROBERT WATERS**

56.  On January 12, 2016, the Maryland State Police [MSP] conducted a routine traffic

stop for driving 51 in a 35 mph speed zone. The driver of the vehicle was ROBERT

RUDOLPH CO WATERS the III, a CO at ECI. Based on evidence observed by the

trooper executing the traffic stop, a search of CO WATERS' vehicle was conducted.

During the search 91 packages of synthetic marijuana [K2] with a total weight of 364

grams were seized, approximately 9 grams of a green leafy substance believed to be

marijuana, a scale, and a grinder were discovered in CO WATERS' vehicle. CO

WATERS' stated that the items belonged to him. While the trooper was searching

the vehicle, he noticed that CO WATERS' cell phone was on and a female was

talking on the phone. The trooper picked up the phone and spoke with the female. She

explained that she was CO WATERS' girlfriend and that she owned the vehicle. The

girlfriend, known to be Taliesha Dorsey, told the trooper that both she and CO

WATERS were CO's at the ECI. The trooper allowed CO WATERS to speak with

Dorsey on the phone. A second trooper overhead CO WATERS say to Dorsey "The

stuff that you bought is getting me jacked up." The 91 packages of synthetic

marijuana were titled "Scooby Snacks" and "Wet Lucy." These items are known to

the writer as types of K2. Based on the individual packaging of the K2, CO

WATERS was charged with Possession with Intent to Distribute [PWID], in addition

to other charges. Based on the writer's experience and knowledge, K2 is a popular

drug smuggled in to ECI by corrupt officers. An ounce of K2, when sold by an

inmate, can net $1200.00 to $1400.00.

22

57.    APRYL ROBINSON, a former CO, was the outside facilitator for East Compound inmate REGINALD JOHNSON. She assisted JOHNSON in a full time capacity in running a lucrative contraband operation by meeting with contraband suppliers, packaging items of contraband to deliver to correctional officers, and handling numerous financial accounts where deposits were made. A cooperating witness who testified told investigators that JOHNSON paid CO WATERS $1500 a trip to smuggle contraband and that CO WATERS smuggled to JOHNSON approximately two to three times a week when he was on shift.

58.    On April 13, 2016, CO WATERS, using (443) 735-9596 was intercepted on Target Telephone 12 used by APRYL ROBINSON. ROBINSON sent an outgoing text message to (443) 735-9596, used by CO WATERS. The text message read "That's fucked up how you're fucking around but not with him [REGINALD JOHNSON]. Is all love though and you better not say nothing." ROBINSON asked CO WATERS why he was smuggling for other inmates and not JOHNSON. In a following call between ROBINSON and CO WATERS, CO WATERS asked ROBINSON "Okay, I heard a whole lot of stuff, cause I ain't been down there, I'm still there or whatever, but I gotta do, I gotta do this drug case and all this stuff before I go back down there." CO WATERS told ROBINSON that he is still employed by ECI but he has to complete a drug program before they allow him back to work. CO WATERS was assigned to the drug program after the car stop in January of 2016. Robinson replied "Yeah he uhh, what happened the other day with the car accident [traffic stop]?" CO WATERS answered "Yeah, yeah, yeah, cause I had a lot of stuff on me then and I

23

was just happy they dropped everything for real and umm." ROBINSON said "no, I'm talking about it's been another one out there, yeah like the other day." CO WATERS asked "Oh yeah, dude [CO DONTE HARRIS] got pulled over." Robinson said "yeah." CO WATERS inquired "He had the crack and shit on him too?" ROBINSON told CO WATERS that another officer [CO DONTE HARRIS] she had met with to deliver items of contraband had also been stopped by the police with the contraband in the car. CO WATERS continued "My girl [CO Teliesha Dorsey] work there and a couple homeboys that I got, they tell me everything for real. They got me on admin leave cause I had the drugs on me, I had weed on me, and everything. I was trying to see [UI] if he could still get it [K2] cause I got a lot of dudes down here now, that crazy, that's uhhh niggers that [UI] I know that's trying to buy it." Your affiant believes that in his call CO WATERS explained that he was still hearing prison gossip because his girlfriend and other friends still work at ECI and keep him informed. He explained about having to go in the drug program after getting caught with drugs in his car. CO WATERS asked ROBINSON if she could still get K2 because he had people that wanted to buy it. Later in the call, ROBINSON asked CO WATERS "Okay, what you [what type], how much [quantity] you was trying to get?" CO WATERS asked if she had any "Wet Lucy shit [type of K2 CO WATERS had in his vehicle during car stop]." ROBINSON said she doesn't have that anymore and CO WATERS replied "Yeah, one nigger said that put him on his ass, he said nigger I was done for three days [K2 made the inmate high for three days]." ROBINSON told CO WATERS she could get the grape and blueberry flavored K2. CO WATERS said

he was able to buy $200.00 worth from her.  They made tentative plans to meet on the following Monday but no further telephonic contact was made between the two and as far as investigators know, the meet never occurred.

59.    During the search of WATERS' residence at 1112 Bryn Mawr, Salisbury, Maryland, the following Subject Electronic Devices were recovered: (1) SAMSUNG GALAXY GRAND PRIME IMEI: 990005925397151 (2) SAMSUNG NOTE 3 IMEI: 990004354275053 (3) LG CELLPHONE S/N: 604CYRN054382 (4) SAMSUNG PHONE  FCC ID: A3LSMG360T (5) X GODY PHONE S/N: 201512059731 (6) SAMSUNG SPRINT PHONE HEX: 99000440035162; (7) USB DRIVE 2.0 ADAPTER.  On October 13, 2016, your affiant spoke telephonically with TELISHA DORSEY, the girlfriend of WATERS. DORSEY said several items belonging to her and her daughter were seized by the FBI during the search of the residence she shares with WATERS on October 5, 2016. DORSEY said only she, WATERS and their daughter reside at the residence. During a subsequent call on October 25, 2016, DORSEY confirmed the items that belonged to her and her daughter. Those items were removed from this affidavit. The remaining items do not belong to DORESY or her daughter. The only other individual residing at the residence is WATERS. Your affiant believes these items belong to WATERS.WATERS was present at the residence during the execution of the search warrant.

### F.    Conclusion

60.    For these reasons, your affiant seeks permission to search the Target Telephones identified in attachment A for evidence of the Target Offenses.

25

I, Special Agent Karen Franks, affirm under penalty of perjury that the facts and circumstances recounted in the foregoing affidavit are true and accurate to the best of my knowledge.

Special Agent Karen Franks
Federal Bureau of Investigation

Sworn to before me this 23 day of December, 2016

J. Mark Coulson
UNITED STATES MAGISTRATE JUDGE

FILED _____ ENTERED
_____ LOGGED _____ RECEIVED

JAN 0 9 2017

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

26

**Attachment A**

**The Subject Electronic Devices, listed below:**

*Cellular Phones Seized from 106 Cherry Street, Pocomoke City, Maryland (home of SHERIMA BELL) (see paragraphs 21 – 27 below)*

1)   VERIZON SAMSUNG CELL PHONE FCC ID A3LSMB311V, MEID

HEX: A00000475C78FB

2)   LG CELL PHONE, FCC ID: BEJLX295, S/N: 908CYZP0007645

*Cellular Phones, Laptop Computers, tablet computers, SD Card, CD, USB drive, thumb drive and external drive Seized from 1005 Zircon Court, Salisbury, Maryland (home of ROZLYN BRATTEN) (see paragraphs 28 - 34 below)*

3)   INSPIRON LAPTOP WITH S/N 9T7RQP1

4)   SAMSUNG GALAXY PHONE, #DE C256691456404415845, TWO (2)

SD CARDS

*Cellular Phones and tablet computer Seized from 113 West London Avenue, Salisbury, Maryland (home of JOCELYN BYRD) (see paragraphs 35 - 41)*

5)   SAMSUNG GALAXY NOTE 5 - SKU: SPHN92032GLD; DEC: 256 6

91 584 006 448 677

6)   LG G4, S/N: 505KPFX0255931, MODEL LS991, FCC ID: ZNFLS991

*Cellular Phones and Notebook Computers Seized from 34708 Main Street, Pittsville, Maryland (home of TRAVIS DENNIS) (see paragraphs 42 - 48 below)*

7)   Blackberry Phone  MEID DEC# 268436458804813652

8)   Blackberry Phone  MEID DEC# 288435459700483650

9)   NEXTBOOK MODEL NX008HD8G, SERIAL YFG1013004928

***Cellular Phones, Computer and iPad Seized from 5818 Edgepark Drive Apartment C, Baltimore, Maryland (home of CHAVIA SAVAGE) (see paragraphs 49 - 56 below)***

   10)   PURPLE VERIZON HTC CELL PHONE   SERIAL # HT19EX101716

   11)   SILVER IPAD, DMQJMB7AF183, S/N 1445SY03C4G8

   12)   SILVER IPHONE, IMEI: 356987062724792

***Cellular Phones, tablet computers, sim cards, Laptop Computer and USB drive Seized from 1112 Bryn Mawr, Salisbury, Maryland (home of ROBERT WATERS) (see paragraphs 57 - 60 below)***

   13)   SAMSUNG GALAXY GRAND PRIME IMEI: 990005925397151

   14)   SAMSUNG NOTE 3 IMEI: 990004354275053

   15)   LG CELLPHONE S/N: 604CYRN054382

   16)   SAMSUNG PHONE  FCC ID: A3LSMG360T

   17)   X GODY PHONE S/N: 201512059731

   18)   SAMSUNG SPRINT PHONE HEX: 99000440035162

   19)   USB DRIVE 2.0 ADAPTER

## Attachment B

This warrant authorizes the search of electronically stored information and other documents related to the items listed on Attachment A for telephone numbers, names, addresses, email addresses, opened and unopened voice-mail messages, text messages, email, communications, photographs, financial records, money transfer records and travel records, which are evidence of conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841, 846.

Because of the possibility that the files examined pursuant to the warrant will include information that is beyond the scope of what the United States has demonstrated the existence probable cause to search for, the search shall be conducted in a manner that will minimize to the greatest extent possible the likelihood that files or other information will be viewed for which there is no probable cause to search.

While this protocol does not prescribe the specific search protocol to be used, it does contain limitations to what government investigators may view during their search, and the searching investigators shall be obligated to document the search methodology used in the event that there is a subsequent challenge to the search that was conducted, pursuant to the following protocol:

With respect to the search of any digitally/electronically stored information that is seized pursuant to this warrant, and described in Attachment A hereto, the search procedure shall include such reasonably available techniques designed to minimize the chance that the government investigators conducting the search will view information that is beyond the scope for which probable cause exists.

The following list of techniques is a non-exclusive list which illustrates the types of search methodology that may avoid an overbroad search, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein:

a.      Use of search methodology to conduct an examination of all the data contained in such hardware, software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth herein by specific date ranges, names of individuals, or organizations;

b.      Searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein;

c.      Physical examination of the storage device, including digitally surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth herein;

29

16 - 3 3 2 5 JMC    16 - 3 3 2 7 JMC —

d.      Opening or reading portions of files that are identified as a result of conducting digital search inquiries in order.

16 - 3 3 4 4 JMC